(41 Misc. Rep. 564.)

SANBORN v. LINDENTHAL, Bridge Com'r.

(Supreme Court, Special Term, New York County.   November, 1903.)

1. MUNICIPAL IMPROVEMENTS—INJUNCTION BY TAXPAYER—WASTE—EVIDENCE.
A taxpayer of New York sued to restrain an alleged waste and illegal
expenditure of public moneys, and showed that in 1898 the board of pub-
lic improvements directed its president, together with the commissioner
of bridges, to prepare plans for a bridge over the East river by way of
Blackwell's Island;   that the board authorized the work in 1899, on an
examination of a general sketch submitted by the commissioner, and that
the municipal assembly in 1900 authorized the work as proposed, and es-
timated the cost, and that subsequently corporate stock was issued.   The
commissioner of bridges in 1902 made detailed plans, changing the sketch.

plan in many respects, but not the general features. The city art commission thereafter approved the new plans; and the board of aldermen, who succeeded the municipal assembly, authorized further issues of corporate stock; and the commissioner of bridges let the work, on the new plans, as modified on the advice of an expert bridge commission selected by the mayor, to the lowest bidder. *Held* to show a valid letting, and that the injunction would not be granted.

Action by Daniel S. Sanborn against Gustav Lindenthal, as bridge commissioner. Motion for an injunction pendente lite. Denied.

H. C. M. Ingraham (George W. Wingate, of counsel), for plaintiff.
George L. Rives, Corp. Counsel (Chase Mellen, of counsel), for defendant.

CLARKE, J.   Application for injunction pendente lite to prevent the commissioner of bridges from opening bids, awarding a contract, and executing same, for superstructure work on the proposed Blackwell's Island Bridge. Plaintiff claims that the plan upon which bids have been invited has never been approved by the proper authorities, and sues, as a taxpayer, to prevent an illegal expenditure of the public moneys, and to prevent waste.

It was the design of the charter of Greater New York (Laws 1901, p. 1, c. 466) to lodge a larger measure of self-government in the new municipality, and, among other things, to relieve it from the necessity of applying to the Legislature every time it contemplated a considerable public improvement for leave to issue its bonds in payment therefor. So in the charter of 1897 (Laws 1897, p. 1, c. 378) it created a new body, designated the "Board of Public Improvements." It provided in section 48:

"The municipal assembly shall have power to provide by ordinance * * * for the building of bridges * * * and may create loans and authorize the issue of bonds or other evidences of indebtedness to pay for the same * * * but no bonds * * * shall be issued * * * unless the proposition for creating such debt, shall first be approved by a resolution or vote of a majority of all the members of the board of estimate and apportionment."

Section 413 provided:

"Except as herein otherwise provided, any public work or improvement within the cognizance and control of any one or more of the departments of the commissioners who constitute the board of public improvements, that may be the subject of contract, must first be duly authorized and approved by a resolution of the board of public improvements and an ordinance or resolution of the municipal assembly. * * * Nothing herein contained shall be construed as conferring on the board of public improvements any of the exclusive powers vested by law in any of the said commissioners * * * concerning the details of any work or improvement."

Section 595, providing for the jurisdiction of the commissioner of bridges, says:

"He shall have cognizance and control * *. * (4) of the construction, repair, maintenance and management of all other bridges that may at any time hereafter be constructed in whole or in part at the expense of the city of New York, or that may be acquired by the city."

This being the state of the law, a resolution was passed by the board of public improvements in November, 1898, by which the com-

missioner of bridges, in connection with the president of the board
of public improvements, was authorized and directed to prepare plans,
surveys, soundings, etc., for the construction of a bridge over the
East river, between the borough of Manhattan and the borough of
Queens. Thereafter a sketch or outline plan was prepared, filed in
the office of the bridge commissioner, and a copy transmitted to said
board. At a meeting of said board held November 29, 1899, it was—

"Resolved, pursuant to the provisions of the Greater New York charter,
that the building of a bridge over the East river, between the boroughs of
Manhattan and Queens, be, and the same hereby is, authorized and approved,
and that the plans therefor prepared by the commissioner of bridges, in con-
junction with the president of the board of public improvements, as provided
by resolution of this board, be, and the same are hereby, approved."

At a subsequent meeting of said board a resolution was passed that
it was desirable that a bridge over the East river, between the
boroughs of Manhattan and Queens, be constructed, and the work
thereon vigorously prosecuted to completion, and a report was adopt-
ed to the municipal assembly, and a statement was given of the ap-
proximate cost of said bridge and lands to be used. The municipal
assembly adopted an ordinance on May 1, 1900, providing:

"The building of a permanent bridge across the Blackwell's Island and
over the East river, between the borough of Manhattan and the borough of
Queens of the city of New York, from at or near the foot of Sixtieth street,
in said borough of Manhattan, to at or near the foot of Charles street, in said
borough of Queens, and the approaches thereto in accordance with plans pre-
pared under the direction of the commissioner of bridges and approved by
the board of public improvements and filed in the office of the commissioner
of bridges on the 29th day of November, 1899, is authorized and approved."

It also provided that the comptroller should from time to time,
when authorized by resolution of the municipal assembly and of the
board of estimate and apportionment, prepare and issue corporate
stock for the purpose of defraying the expense. This resolution was
duly approved by the mayor. Appropriations were made December
1, 1898, $50,000; December 5, 1899, $1,000,000; March 29, 1901,
$550,000. The plans approved by the board of public improvements
were general plans showing the general character and design of the
bridge. They were not plans upon which bids could be advertised
for, as they did not show the essential details of construction. They
were such plans as are usually prepared to afford the basis of author-
izing a structure contemplated before the contract shall be let.
When the present commissioner took office, January 1, 1902, no de-
tailed plans had been submitted to or approved by his predecessor
in office. In the meanwhile the charter, by the act of 1901, had been
most materially amended. The municipal assembly and the board
of public improvements had been abolished. For the municipal
assembly was substituted the board of aldermen. In the charter be-
fore and after amendment was provision for an art commission, and
section 637 provided that no work of art should become the property
of the city unless such work of art and a statement of its proposed
location should be submitted to and approved by the commission,
and the section provided:

"When so requested by the mayor or the board of aldermen the commission shall act in a similar capacity with similar powers in respect of the designs of  *   *   *  bridges, approaches  *   *   *  or other structures erected or to be erected upon land belonging to the city."

By the act of 1901 this provision was added:

"And said commission shall so act and its approval shall be required for every such structure which shall hereafter be erected or contracted for at an expense exceeding $1,000,000."

The present commissioner of bridges took up the study of this bridge and its outline plan, and worked out many of its details in a different manner from that suggested in the original sketch plan. The mayor submitted these and the original plans to a commission of expert bridge engineers, and upon their suggestion these plans were changed and modified, and a final plan—the one now existing —was adopted by the commissioner. The original plan and the present plan were by the mayor submitted to the art commission. On February 10, 1903, the art commission adopted a resolution disapproving the original plan submitted to the old board of public improvements, and approved the revised plans prepared by defendant, except as to certain minor details. In July, 1903, the board of estimate and apportionment and the board of aldermen authorized an issue of corporate stock of $3,868,000 for the construction of the bridge, having also authorized $1,627,000 in July, 1902; making a total authorization to date of $7,095,000. Specifications, detail drawings, and contracts were prepared, and bids invited by public advertisement for the superstructure. Such bids were opened in September, 1903, but, as there was only one bidder, the commissioner rejected all bids, and readvertised. The new bids were opened on November 5, 1903. The order to show cause, without an injunction, herein, was served on November 6, 1903, and the motion was argued before me on November 10th. The commissioner awarded the contract to the lowest bidder on November 9th, so that all that remains of the order to show cause why an injunction should not issue is as to executing the contract. The ground of the action is that under the provisions of law hereinbefore recited, and the proceedings had, the only lawful bridge that could be built was the one designed by the preceding commissioner, and the plans of which were approved by the board of public improvements and the municipal assembly, and that, as the specifications and plans and designs as they now exist differ from the plan so approved, they are illegal. I cannot come to any such conclusion. The purport and intent of the provisions of the charter of 1897 (Laws 1897, p. 1, c. 378) was that before embarking in any great public improvement the general plan and the general estimate as to cost should be submitted to and approved by the boards and bodies enumerated. We still have the general plan of a bridge, by way of Blackwell's Island, between Manhattan and Queens, with the same termini; the span 130 feet above high water; with provisions made for elevated trains, trolleys, vehicles, and foot passengers; with a general approximation as to cost. Of course, be-

fore actual construction and bidding, only an approximation could be arrived at. The very section relied on (section 413) expressly provides:

"Nothing herein contained shall be construed as conferring on the board of public improvements any of the exclusive powers vested by law in any of the said commissioners concerning the details of any work or improvement."

Surely, where the various cars, vehicles, and passengers shall travel on the bridge, are details of its design left to the commissioner, and so of the other changes. It was the general scheme that was to be approved. Furthermore, the art commission called in by the mayor, and vested with the veto power by law, has rejected the original design. That disapproval disposed of it. The bridge could not thereafter be constructed in accordance therewith. The board of aldermen and the board of estimate and apportionment—the bodies now vested with the powers of the municipal assembly and the board of public improvements—have, since the adoption of the revised plans, appropriated large sums of money for the construction of the bridge. It is a great and necessary public work. It seems to me that the construction of this bridge according to the plans under which bids were asked and opened, and the contract awarded, has received the sanction of the public bodies whose approval is required. I see no reason to apprehend a waste of the public moneys.

Motion denied; $10 costs.